# IN THE COURT OF APPEALS OF IOWA

―――――――――――――

No. 26-0617
Filed June 24, 2026

―――――――――――――

**In the Interest of M.M. and K.B., Minor Children,**

**A.B., Mother,**
Appellant.

―――――――――――――

Appeal from the Iowa District Court for Van Buren County,
The Honorable Patrick J. McAvan, Judge.

―――――――――――――

**AFFIRMED**

―――――――――――――

Patricia J. Lipski, Washington, attorney for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight,
Assistant Attorney General, attorneys for appellee State.

Kimberly A. Auge of The Auge Law Firm, Fort Madison, attorney
and guardian ad litem for minor children.

―――――――――――――

Considered without oral argument
by Tabor, C.J., and Chicchelly and Sandy, JJ.
Opinion by Tabor, C.J.

**TABOR, Chief Judge.**

A mother, Angela, appeals the termination of her parental rights to M.M., her thirteen-year-old son, and K.B., her nine-year-old daughter.[1] Angela does not challenge the statutory grounds for termination. *See* Iowa Code § 232.116(1)(f) (2025). Rather, she argues that: (1) termination is not in the children's best interests, and (2) termination will be harmful to M.M. and K.B. because of their strong bond with her. *See id*. § 232.116(2), (3)(c).

But as the juvenile court aptly observed, "Angela fails to grasp or acknowledge the trauma her absence had on each of her children." Given that trauma, preserving parental rights is not in the children's best interests. Likewise, Angela has not offered clear and convincing evidence that because of the closeness of the parent-child relationships, termination would be detrimental to her son and daughter. Thus, we affirm the juvenile court order.

## I.    Facts and Prior Proceedings

Angela admitted using methamphetamine while caring for M.M. and K.B., including one week before giving birth to their younger sibling, J.B., in January 2024.[2] To placate the department's concerns, Angela claimed the children were at school when she ingested methamphetamine—which she admitted doing weekly. But her claim was doubtful because M.M. was not

---

[1] M.M.'s father is deceased, and K.B.'s father does not appeal the termination of his rights.

[2] Angela told social workers that she didn't know she was pregnant until she was admitted to the hospital with abdominal pain. The Iowa Department of Health and Human Services placed J.B. in foster care five days after his birth. He remained out of Angela's care through the termination of her parental rights in June 2025. He is not the subject of this appeal.

attending school.[3] Still, the department worked with Angela to develop a safety plan to ensure that her drug use did not endanger the children. Regrettably, Angela recommended relatives whom she knew were not safe caregivers.[4] The children were in that home for about two weeks when the relatives asked the department to remove them.

As the juvenile court explained, "[t]hus began a difficult and confusing time for the children." After the abrupt move from their uncle's home, the department placed the children with K.B.'s putative father. That placement lasted only two days. Short on options, the department retained legal custody but returned the children to Angela's care in mid-March 2024. Ten days later, she was evicted from her home. The family lived in a homeless shelter until May when the department helped line up a rent-free apartment.[5]

But the children experienced more upheaval in August 2024 when police arrested Angela on a warrant for failure to appear for her probation hearing. Despite knowing about the warrant and being advised to plan for K.B. and M.M., she had made no provision for the children's care if she went to jail. Police found the children home alone; M.M. was trying to prepare something for his sister to eat—with few groceries on hand.

---

[3] Because M.M. had behavioral issues, his school placed him on "pre-expulsion status, whereby he [was] not permitted on school property." He was supposed to participate in online learning, but Angela did not enforce the educational requirements at home, creating a "significant educational void" for the preteen.

[4] The guardian ad litem (GAL) reported that Angela chose to place her children with their uncle, who Angela later revealed had "molested her when she was young."

[5] Angela accessed services during this time, including a substance-use evaluation that diagnosed her with cannabis- and amphetamine-use disorder. She tested negative for drugs in April 2024.

After the welfare check, the children followed different trajectories. K.B. moved in with the foster parents who were caring for her younger brother. She found stability and comfort in their routines. The eight-year-old reported being frightened by her mother not coming home from the probation appointment and by a later visit behind plexiglass at the jail. K.B. told her GAL that she did not want unsupervised visits with Angela.[6]

By contrast, M.M. did not settle into foster care. In fact, his aggression escalated while in shelter care, and the department transferred him to a qualified residential treatment program (QRTP) in September 2024. The QRTP was nearly five hours away from his mother's home. But the department believed it was the level of care he needed. As the GAL reported, "This QRTP program will offer him the benefit of getting his education (which was not occurring in his mother's care), mental health services (including [behavioral health intervention services]), and medication management, as deemed necessary." M.M. also received needed dental care there; as the GAL described, his teeth were "in deplorable condition with multiple cavities and abscess[es] which required medical treatment. After surgery for the tooth issues, [M.M.] no longer has complaints about mouth pain."

Meanwhile, Angela struggled to engage in services. She tested positive for methamphetamine in September 2024 and was unsuccessfully discharged from treatment in October. She also faced a jail sentence for truancy and driving under suspension. As the juvenile court noted, Angela later disclosed that during that time she suffered "significant domestic violence"

---

[6] K.B. was also reluctant to continue interactions with her brother, reporting that he was "mean" and sometimes scared her.

perpetrated by J.B.'s father. She was hospitalized in November after J.B.'s father rammed her with his truck.

During the early months of 2025, Angela had sporadic contact with the department and virtually no interaction with her children. When M.M. tried to call his mother from the QRTP, he would receive no answer. And Angela had no in-person visits with K.B. after December 2024. The department arranged two visits for K.B. while her mother was in jail, but the child refused to go in and asked to go back to her foster home. And after that, K.B. told the social workers that she didn't want to see her mom. Angela's only attempts to reach out to her daughter were two text messages and two cards.

After her release from jail, Angela did not tell the department where she was staying, nor did she reach out to service providers. In February 2025, she finally met with social workers in Fairfield, revealing that she was living in a one-bedroom camper in Batavia. The department did not believe that the camper was an appropriate environment for the children. But by the fall of 2025, Angela was making improvements. She found stable housing and employment. She started participating in mental-health therapy and family treatment court. She had an in-person visit with M.M. in December 2025, and K.B. agreed to a supervised visit with Angela in January 2026.

Meanwhile, the State petitioned for termination of parental rights in September 2025. The juvenile court held a combined permanency review and termination hearing in December. The judge started the hearing with an unsworn conversation with M.M., who attended virtually. M.M. told the court he was proud of "getting into public school" and "playing basketball." He said he looked forward to having visits with his mother and sister.

The court also heard from Matthew Royster, a mental-health counselor who contracted with the QRTP where M.M. lived. He described M.M. as "a good kid" with "a very big heart." Royster noted M.M.'s "tremendous progress" in self-regulation and accountability since entering the QRTP. But the therapist remained concerned about Angela's "false promises" to her son. For instance, Angela assured M.M. that "we're all going to get back together," including J.B. and K.B., when that was not a real possibility. She also agreed to online therapy sessions with M.M. but failed to sign onto her computer. M.M. was "extremely loyal to his mom" and negatively impacted by the inconsistency of her contact with him. Royster reported that M.M. had stopped wanting to go back home but did want Angela to move closer to his school.

The evidence showed that K.B. had a different mindset. The department reported that she appreciated the stability and predictability of her foster home. She was "very happy" living there with her little brother; she was doing well in fourth grade and excelled at reading. As the district court noted, "[K.B] identified this home as a safe space and has fiercely guarded this placement." The social worker testified K.B. was "fully integrated" into her foster home, which was a pre-adoptive placement. She also testified that K.B. considers her little brother and the foster parents as her family.

With the court's approval, Angela filed a written statement after the hearing. She chronicled her struggle with domestic violence, substance use, and housing insecurity. She wrote: "I feel like my children were stolen from me. I am not allowed to know anything about them." She maintained that she

had not received "any support" from the department with transportation, housing, employment, mental-health, or substance-use issues.[7]

The juvenile court issued an order terminating Angela's parental rights in February 2026. She now appeals.

## II.    Standard and Scope of Review

We engage in a de novo review of termination proceedings, "examining both the facts and law and adjudicating anew those issues properly preserved and presented." *In re A.R.*, 932 N.W.2d 588, 589 n.1 (Iowa Ct. App. 2019).

Under Iowa Code section 232.116, those issues are generally three-fold: (1) did the State prove a statutory ground for termination under section 232.116(1); (2) is termination in the children's best interests under the section 232.116(2) framework; and (3) should we apply a permissive exception under section 232.116(3)? *In re L.A.*, 20 N.W.3d 529, 532 (Iowa Ct. App. 2025) (en banc). We only address the claims raised by a parent on appeal. *Id.*

## III.    Analysis

Although she melds the two issues into one, Angela raises claims under both subsections (2) and (3) of section 232.116. *Id.* at 534 ("Conflating the second and third steps based on a claimed bond with the child is not uncommon."). We tease them apart on appeal.

---

[7] The GAL refuted the mother's allegations and argued that the record contradicted her "victim stance."

### A.    Best Interests

In assessing the children's best interests, we give primary consideration to their safety, the best placement for furthering their long-term nurturing and growth, and to their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021). As part of that assessment, we weigh the claimed bond between the mother and children. *L.A.*, 20 N.W.3d at 535. We also consider K.B.'s integration into her foster home. *See* Iowa Code § 232.116(2)(b).

As directed by statute, the juvenile court prioritized the children's safety and what placement could best support their needs. The court found, "[t]he children need more than Angela can provide them. It is time for the children to focus on the permanency they need and deserve." We concur in those sentiments. As the juvenile court found, Angela cannot safely care for these children. The court was blunt: "[M.M.] and [K.B.] are not simply possessions that can be returned now that Angela has a place for them. They are young people with identified needs that Angela does not recognize and has no ability to meet."

Both M.M. and K.B. have found the support they need in their out-of-home placements. K.B.'s family identity is with her foster family. *See* Iowa Code § 232.116(2)(b). "The child deserves and needs the stability and permanency they offer." *In re J.B.L.*, 844 N.W.2d 703, 706 (Iowa Ct. App. 2014). As for M.M., he has endured many disappointments from Angela's inability to keep unrealistic promises. Suspending his false hope has become harmful to his well-being. As the GAL noted, M.M. was "not yet placed with a foster care family as he remains navigating his QRTP program." But the GAL offered this reasoned opinion:

He had made leaps and bounds in forward progress in his treatment on his own without the support of his Mother and, in a matter of less than 2 weeks after an in-person visit from his mother, this progress has completely unraveled. He deserves the permanency to be awarded with a healthy and stable forever home after all the hard work he has put in to improve his behaviors. Sadly, but clearly the contact with his Mother does not serve [M.M.'s] long-term best interests.

We agree that termination was in the best interests of both children.

## B. Parent-Child Bonds

Angela also argues that her legal relationships with M.M. and K.B. should be preserved under Iowa Code section 232.116(3)(c). That provision allows a court to deny termination if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c); *In re A.B.*, 957 N.W.2d 280, 300–01 (Iowa 2021). The burden rests with Angela to prove the exception applies. *See L.A.*, 20 N.W.3d at 535 n.3.

Angela urges that the juvenile court "should have denied the termination petitions, due to the parent-child bond, particularly the strong bond between [herself] and M.M." As the juvenile court found, "Angela acknowledges that her bond with [M.M.] was damaged by her past actions but turns around and blames the department for not fixing and restoring that bond." And although M.M. harbors a deep loyalty to his mother, Angela did not present evidence that terminating her parental rights would be more detrimental than postponing his permanency. *See A.B.*, 957 N.W.2d at 301. Angela did not meet her burden of showing termination posed greater harm to M.M. than subjecting him to continuing uncertainty. The proof is even

weaker for K.B., whose relationship with her mother deteriorated because of the long separation.

We affirm the termination order.

**AFFIRMED.**